**O**

# United States District Court
# Central District of California

| | |
|---|---|
| PROGRESSIVE SEMICONDUCTOR SOLUTIONS LLC, | Case No. 8:13-cv-01535-ODW(JEMx) |
| Plaintiff, | **CLAIM-CONSTRUCTION ORDER** |
| v. | **[59]** |
| QUALCOMM TECHNOLOGIES, INC., | |
| Defendant. | |

## I.   INTRODUCTION

This is a patent-infringement suit involving memory in semiconductor devices, and specifically relates to an improved circuit design for such memory.  Plaintiff Progressive Semiconductor Solutions, LLC. ("Progressive") asserts U.S. Patent Nos. 6,473,349 ("the '349 Patent") and 6,862,208 ("the '208 Patent") against Qualcomm Technologies, Inc. ("Qualcomm").  The constructions of five terms across the '349 and '208 Patents remain in dispute.

## II.   BACKGROUND

Progressive is the owner of the '349 Patent titled "Cascode sense AMP and column select circuit and method of operation," and the '208 Patent titled "Memory device with sense amplifier and self-timed latch."  (SAC ¶¶ 7–8.)

On September 30, 2014, Progressive brought a patent-infringement suit against Defendants Marvell Semiconductor Inc. and Qualcomm Technologies Inc.   (ECF No. 1.)  On March 3, 2014, the Court severed the action under 35 U.S.C. § 299.  (ECF No. 45.)  Progressive filed an amended complaint against Qualcomm (ECF No. 46), and a new civil action against Marvell, *Progressive Semiconductor Solutions LLC v. Marvell Semiconductor*, Case No. 8:14-cv-00330-ODW-JEM (C.D. Cal. Aug. 21, 2014).

The two suits were coordinated for all purposes except trial.  On August 6, 2014, the parties filed their final amended joint claim chart.  (ECF No. 83.)  The parties dispute the construction of five terms: (1) "the amplifier being controlled by the sense enable signal and being made operative only when the pair of pass transistors are made nonconductive by the sense enable signal" ('349 Patent); (2) "in response to a sense enable signal" ('349 Patent); (3) "sense enable signal" ('208 Patent); (4) "at about the same time as the assertion of the sense enable signal" ('208 Patent); (5) "storing data corresponding to the amplified data signal only in response to the amplified data signal"/"latching the data in response to only the amplified data signal" ('208 Patent).  (*Id.*)

On August 11, 2014, the Court held a consolidated claim-construction hearing. (ECF No. 87.)  The parties informed the Court that a settlement had been reached between Progressive and Marvell.   On August 21, 2014, Progressive filed a Stipulation to Dismiss Marvell from the action.  *Marvell*, Case No. 8:14-cv-00330-ODW-JEM, ECF No. 78.  The Court construes the disputed terms below.

### III.   LEGAL STANDARD

The purpose of claim construction is to determine the meaning and scope of the patent claims alleged to be infringed.  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).  Claim construction is a question of law to be decided by the court.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967,

/ / /

979 (Fed. Cir. 1995).  In determining the proper construction of a claim, the Court reviews both intrinsic and extrinsic evidence, placing emphasis on the former.

**A. Intrinsic Evidence**

The court begins with intrinsic evidence of claim meaning—which consists of the claim language, patent specification, and, if in evidence, prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

The Court must always begin with an examination of the claim language itself. *August Tech. Corp. v. Camtek, Ltd.*, 655 F.3d 1278, 1284 (Fed. Cir. 2011); *see also Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("The claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim.").  Claim language is paramount; the other intrinsic and extrinsic evidence—while valuable—cannot be utilized to rewrite the claim language.  *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004).

The terms used in the claims are generally given their "ordinary and customary meaning."  *Phillips*, 415 F.3d at 1312.  This "ordinary and customary meaning" is the meaning as understood by a person of ordinary skill in the art ("POSITA") in question at the time of the invention.  *Id*.  The POSITA "is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Id.*

A patentee is presumed to have intended the ordinary meaning of a claim term unless the patentee (1) sets out a definition and acts as his own lexicographer, or (2) disavows the full scope of a claim term either in the specification or during prosecution."  *Thorner v. Sony Comp. Entm't Am. LLC,* 669 F.3d 1362, 1365 (Fed. Cir. 2012).

The specification is "always highly relevant to the claim construction analysis."  *Markman*, 52 F.3d at 978.  "[T]he specification may reveal a special definition given

to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. But the Court must be wary of "improperly importing a limitation from the specification into the claims." *Retractable Techs., Inc. v. Becton*, 653 F.3d 1296, 1305 (Fed. Cir. 2011).

The Court may also consider the patent's prosecution history. The prosecution history encompasses the complete record of the proceedings before the PTO, including the prior art cited during the examination of the patent." *Id.* The prosecution history provides evidence about how the PTO and the inventor understood the invention. *Id.* But "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

**B. Extrinsic evidence**

Courts may also rely on extrinsic evidence to better understand the underlying technology and to determine what a POSITA would understand the claim terms to mean. *Phillips*, 415 F.3d at 1318. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert testimony, dictionaries, and learned treatises." *Id.* at 1317. But while extrinsic evidence can be useful, it is "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319. Thus, it is less significant than intrinsic evidence. *Id.*

## IV.   DISCUSSION

The patents at issue address memory within a semiconductor chip, and more particularly, novel circuit designs and methods for accessing that memory in a manner that increases speed and reliability, while reducing power consumption of the chip. To understand the patents, some background information is useful.

/ / /

## A. Background of the inventions

Qualcomm sells semiconductor chips referred to as integrated circuits. The data stored on the chips is in SRAM. SRAM data is stored in tiny circuits, called memory cells, which collectively form a memory array. (ECF No. 75, Ex. A.) Data is accessed via unique addresses assigned to the individual memory cells, which are organized into rows and columns. (*Id.*) Thus, a memory cell's address consists of a row and column address part. (*Id.*) "Wordlines" run along the rows of the memory while "bit lines" run up and down. (*Id.*) Each memory cell is associated with a wordline and two "complementary" bit lines, and each set of complementary bit lines is connected to a sense amplifier. (*Id.*)

The electric signal held in the memory cells is very small. (*Id.*) The signal is read as two complementary or "differential" signals that each have different voltage values. (*Id.*) The differential signals that appear on the bit lines collectively represent a single bit of logical information—either 0 or 1. (*Id.*) But because the voltage differences involved are so small, a special "sense amplifier" circuit is employed to detect and amplify the differential signals. (*Id.*) The retrieved bit (0 or 1) from the selected memory cell is then stored in a storage device called a "latch" for later use. (*Id.*)

A transistor is commonly used as an electronic switch. (*Id.*) Pass transistors may be used to construct an "isolation circuit," because when the transistors are turned "off," they serve to "isolate" one part of the circuit (for example, the data paths) from another part of the circuit (for example, the sense amplifier). (*Id.*) The pass transistors allow variable signals to pass and travel to the sense amplifier when they are conductive; signals cannot travel to the sense amplifier when the pass transistors are nonconductive. (*Id.*)

The '349 Patent is directed to sense amplifier circuitry used in RAM. The patent discloses configurations of sense amplifier circuitry that avoid drawing excess charge from the bit lines.

The '208 Patent is also directed to amplifying circuitry for use in RAMs.  ('208 Patent 1:5–13.)  The patent discloses an isolation circuit and a self-timed latch.  The self-timed latch does not require a clock signal.  (*Id.* 3:28–32.)  Rather, its timing is determined by the incoming data signals generated by the sense amplifier.  (*Id.*)

Both patents explain that the designs decrease the chips' size and power consumption while increasing the speed and power.

**B. Disputed claim terms of the '349 Patent**

| CLAIM TERM | PLAINTIFF'S CONSTRUCTION | DEFENDANT'S CONSTRUCTION |
|---|---|---|
| 1. **"the amplifier being controlled by the sense enable signal and being made operative only when the pair of pass transistors are made nonconductive by the sense enable signal"** | Plain meaning, except as to "operative" and "sense enable signal" | "the sense enable signal simultaneously activates the amplifier and turns off the pair of pass transistors" |

The parties request construction of an entire limitation—"the amplifier being controlled by the sense enable signal and being made operative only when the pair of pas s transistors are made nonconductive by the sense enable signal"—but only actually dispute the meaning of "operative only when" in the context of the limitation. Essentially, the parties dispute whether "operative only when" expresses temporal requirements that demand *simultaneous* coordination of the isolation and amplification processes by the sense enable signal.

Progressive asserts that the claim language does not expressly or impliedly require that the sense enable signal "simultaneously activate" the amplifier and deactivate the pass transistor.  Rather, Progressive aruges, the claim language is broad enough to permit either a simultaneous or sequential effect.  Qualcomm argues that

/ / /

6

because the sense enable signal is used to trigger processes at *both* the amplifier and the pass transistors, simultaneous coordination is necessarily required.

Although the limitation contains technical terminology (e.g., amplifier, sense enable signal, and pass transistors) the disputed langue itself is a general-usage phrase that neither party asserts has any specialized meaning in the art.

Beginning with the words of the claims themselves, the plain meaning of "operative only when" does not convey simultaneous coordination. Rather, it indicates a condition that must be met: the pass transistors must be nonconductive for the sense amplifier to function.

The amplifier described in the '349 Patent is efficient in power consumption. (*See* '349 Patent 1:38–40 ("An objecive of memory sense amplifiers is to avoid drawing excess charge from a bit line subsequent to clocking the sense amplifer.")). The patent explains that the amplifier is "operative" (amplifying a differential signal) *only when* it can avoid drawing excess charge from the bit lines. (*Id.* 7:42–45; 6:67–7:1 ("[The] sense amplifier **72** does not drain current from either bit line after sensing.")) And the amplifier can avoid drawing excess charge from the bit lines *only when* the pair of pass transistors "are made nonconductive" by the sense enable signal. (*Id.* 8:37–41.) Although the claim language indicates the sense enable signal's dual function—amplification and isolation—this does not dictate that these processes be synchronous, as Qualcomm urges.

In support of its simultaneous-coordination argument, Qualcomm points to language in the specification that instructs when the sense enable signal is asserted, it turns on the amplifier and turns off the pass transistors. (*E.g.*, '349 Patent at 3:41–45 ("When the signal SE is asserted, pass gates 30 and 31 are turned off. Transistor 39 is turned on when signal SE is asserted."); 4:6-8 ("when sense enable singal SE activates amplifier 47, pass gates 44 function to disconnect amplifier 47 from data line pair."); 4:66–5:1 ("[w]hen the sense enable signal SE is asserted, P-15 channel transistor pass gates 70 and 72 are turned off.").) But this language does not specify that the

resulting effects (activation and deactivation) are *simultaneous*.  The specification does not clearly redefine the conditional "operative only when" to impliclitly or explicitly require synchronicity.  Indeed the extrinsic evidence calls into question whether the signal could arrive at two separate locations within a circuit at *exactly* the same time.  (*See* ECF No. 80, Ex. 1.)

"Operative only when" does not suggest, by itself, anything regarding simulatenous events.  The specification discloses that a single singal—the sense enable signal—triggers both the amplifier and the pass transistors, but nothing in the claims, specification, or prosecution history indicate the applicant's intention to mandate simultaneous coordination.  Accordingly, there is no reason to deviate from the plain conditional meaning of the disputed language: the pass transistors must be nonconductive for the sense amplifier to function.

| CLAIM TERM | PLAINTIFF'S CONSTRUCTION | DEFENDANT'S CONSTRUCTION |
|---|---|---|
| 2. **"in response to a sense enable signal"** | Plain meaning, except as to except again as to the technical term "sense enable signal" | "directly controlled by a [the] sense enable signal" |

The presumed meaning of "in response to" is the plain and ordinary meaning of the phrase.  *Phillips*, 415 F.3d at 1312.  "In response to" is a general-usage term that neither party asserts has any specialized meaning in the art.

Progressive asserts that "in response to" should be given its plain and ordinary meaning.  Qualcomm argues that, read in context of the claims and specification, the meaning of "in response to" is "directly controlled by."  Qualcomm argues that the specification provides for a direct cause-and-effect relationship between the sense enable signal and the pass transistor control.  (*See, e.g.*, '349 Patent 3:41–42 ("When the signal SE is asserted, pass gates 30 and 31 are turned off."); 4:6–8 ("[W]hen sense enable signal SE activates amplifier 47, pass gates 44 function to disconnect amplifier

47 from the data line pair.").)  Thus, Qualcomm asserts, the Court should adopt its proposed construction to make clear that the sense enable signal—and no other signal—controls the isloation process.

Claim 1 of the '349 Patent claims, in relevant part, reads:

A sense amplifier comprising: a pair of pass transistors having first and second inputs respectively connected to a data path and complementary data path for receiving a differential data signal, the pair of pass transistors respectively connecting the data path and complementary data path at first and second outputs thereof *in response to a sense enable signal*, the first and second inputs of the pair of pass transistors are not electrically the same as the first and second outputs thereof when the pair of pass transistors are *disabled by the sense enable signal* . . . .

(8:30–41 (emphasis added).  Neither the claims nor the disclosure are ambiguous as to whether the data line inputs are dependent on any signal other than sense enable signal.

The function of claim construction is to clarify and, when necessary, explain what the patentee covered by the claims.  *S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).  Construction of the disputed language is unnecessary here, as the claim scope is clear.  The plain meaning of "in response to" conveys a stimulus and an effect.   Read in context of the claims and specification, that relationship is unchanged: the plain meaning of  "in response to" would be understood to mean that the pass transistors react to the stimulus of the sense enable signal.  Because the intrinsic evidence does not mandate a specialized definition of "in response to," the Court declines to depart from its plain and ordinary meaning.

/ / /

/ / /

/ / /

/ / /

**C. Disputed terms of the '208 Patent**

| CLAIM TERM | PLAINTIFF'S CONSTRUCTION | DEFENDANT'S CONSTRUCTION |
|---|---|---|
| 1. **"sense enable signal"** | Plain meaning; "a signal that enables the sense amplifier to function as intended" | Plain meaning |

Although both parties agree that the plain meaning of "sense enable signal" applies, the parties dispute what that plain meaning is. Progressive asserts that the plain and ordinary meaning of sense enable signal is "a signal that enables the sense amplifier to function as intended."

Qualcomm argues that Progressive's proposed construction is confusing and unnecessary because the full description of the sense enable singal's function is already given in the claim. The Court agrees.

The patent claims "a sense amplifier for amplifying a data signal from a selected one of the plurality of memory cells via the bit line to provide an amplified data signal . . . *in response to asserting a sense enable signal*." ('208 Patent 7:5–8) (emphasis added).) Thus, the patent is clear that the function of the sense enable signal is to stimulate the sense amplifier to amplify a data signal. (*See also id.* 1:25–27.) Thus, the construction "function as intended" is superfluous because the intended function is clearly stated in the claim.

The ordinary meaning of the "sense enable signal"—read in the context of the patent—is clear and the specification is consistent with that meaning. Accordingly, the Court declines to depart from the ordinary meaning of "sense enable signal."

/ / /

/ / /

/ / /

/ / /

/ / /

| CLAIM TERM | PLAINTIFF'S CONSTRUCTION | DEFENDANT'S CONSTRUCTION |
|---|---|---|
| 2. **"at about the same time as the assertion of the sense enable signal"** | "immediately before or immediately after the assertion of the sense enable signal, during a time span that is a fraction of the associated clock signal's period" | Indefinite |

Claims 1 and 22 of the '208 Patent recite that the memory cells are decoupled from the sense amplifier "at about the same time" as the assertion of the sense enable signal.  (7:9–13; 10:23–25.)  The parties dispute whether "at about the same time" is indefinite.

For a patent claim to be valid it must "particularly point [] out and distinctly claim[] the subject matter which the applicant regards as his invention." 35 U.S.C. § 112(b).  The purpose of this definiteness requirement is "to ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005).  A claim is indefinite if, when "read in light of the specification delineating the patent, and the prosecution history, [the claims] fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014).

Qualcomm contends that "at about the same time" is an indefinite term of degree, which cannot be construed, because no objective anchor is provided in the specification.  The claim term at issue here—"about"—is a term of degree. *Datamize, LLC*, 417 F.3d at 1351.  When the patentee uses a word of degree, the court "must determine whether the patent's specification provides some standard for measuring that degree." *Seattle Box Co. v. Indus. Crating & Packing, Inc.*, 731 F.2d 818, 826

(Fed. Cir. 1984).  If the specification does not provide a standard for imposing a more precise construction of the term, the Federal Circuit has ruled that imposing a more precise construction would be error.  *See Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 907 (Fed. Cir. 2005); *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1360 (Fed. Cir. 2003).

Here, the Court finds that the '208 Patent specification provides a sufficient standard for measuring with reasonable certainty the boundaries of "at about the same time."  The specification provides a detailed discussion about the timing and sequence of the two relevant signals and corresponding events.

Two signals are asserted "at about the same time:" (1) the sense enable signal—which is responsible for amplyfing the differential data signal—and (2) the isolation (CD) signal—which, when driven high, is responsible for decoupling the memory cell from the amplifier.  Figured 4 shows the temporal relationship between the circuit signals, as a function of time:



Figure 4 shows the operation of the sense enable and isolation signals over a period of time equal to three clock cycles.[1]  Towards the end of the first clock cycle

---

[1] The clock cycles are defined between the dotted lines.

(highlighted in green), isolation signal CD is asserted and the sense enable signal is asserted (see red dots)—"at about the same time."  The timing of the two signals are "logically derived from the clock signal"[2]—a known point of reference.  (*Id.* 4:4–7.)

The patent explains that the sense enable signal should be asserted "[a]fter a predetermined period of time from when the CD signal is driven low at **405** . . . ."  (*Id.* 4:1–4.  This "predetermined period of time" is determined by the POSITA based on the intended application (*e.g.*, DRAM or SRAM).  The description of Figure 4 states that at "about the same time that the SENSE ENABLE signal is asserted the CD signal is driven high to isolate the local data lines LDL **305** and *LDL **307** from the bit lines . . . ."  ( *Id.* 4:9–12.)

Figure 4 also shows the time span during which a differential data signal is generated (the time span during which one of the signal's voltage is pulled down):



/ / /

---

[2] The clock signal is provided by clock circuitry external to the memory device.  The clock signal is represented in Figure 5 of the '208 Patent.  (*Id.* 3:46–47.)

Progressive has also presented extrinsic evidence that the term "at about the same time" is easily understood by a POSITA.  The Federal Circuit has explained that although courts "have emphasized the importance of intrinsic evidence in claim construction, we have also authorized district courts to rely on extrinsic evidence, such as expert testimony."  *Datamize*, 417 F.3d at 1348 (internal quotation marks omitted). The opinion of an expert can illuminate the meaning of an ambiguous term of degree. *See Datamize*, 417 F.3d at 1353-54; *Amgen, Inc. v. Chugai Pharm. Co., Ltd.*, 927 F.2d 1200, 1218 (Fed. Cir. 1991).

Regarding "at about the same time" Progressive's expert Dr. John Hayes testified that the specification explains to him—as a POSITA—how to design an integrated circuit like the claimed invention.  (ECF No. 80, Ex. A.)  Dr. Hayes testified that "it would not be difficult for a skilled artisan to sequence the signals in the desired manner [because] . . . the timing of the SENSE ENABLE and CD signals is based on the clock signal and is therefore a known point of reference.  (*Id.*) Dr. Hayes also testified that because the patent provides a clear signal sequence— *after* a diferential data signal as been generated but *before* the sense enable signal is deasserted—and Figure 4 shows the time span during which the differential data signal is generated, a POSITA has sufficient data to design the circuit in accordance with the claim or to avoid infringement.  (*Id.*)

Qualcomm argues that Figure 4 does not provide a *standard* for measuring whether signals are triggered at the same time, but rather only illustrates that signals that are triggered at exactly the same time—as shown in the drawing—are triggered at "about the same time."  Qualcomm asserts that Figure 4 does not teach how far apart those signals can be triggered and still fall within the about-the-same-time scope.

The Court does not agree.  The '208 Patent teaches specific confines within which the the two signals should be asserted—(1) within a single clock cycle, (2) after a differential data signal has been generated, and (3) before the sense enable signal has been deasserted (driven low).  Additionally, the written description explains that

timing signals are logically derived from the clock signal.  ('208 Patent 76:24–77:4.) The timing diagram provides all the data necessary for a POSITA to understand the boundaries of the claim to a reasonable certainty.

The omission of a specific, quantifiable time period (e.g., "within 10 nanoseconds") within which the two events should occur is reasonable for this type of invention.  Circuit designers require some flexibility and discretion to program the timing in accordance with the desired application.  Thus, claiming events that occur within a narrow, specified window of time (a single clock cycle) and "at about the same time" is sufficinetly definite under § 112(b).  The language "at about the same time" is properly construed as: "After a differential data signal is generated but before the sense enable signal is deasserted, occurring within a single clock cycle."

| CLAIM TERM | PLAINTIFF'S CONSTRUCTION | DEFENDANT'S CONSTRUCTION |
|---|---|---|
| 3. **"storing data corresponding to the amplified data signal only in response to the amplified data signal" / "latching the data in response to only the amplified data signal"** | Plain meaning | "storing data . . . data signal *only dependent on* the amplified data signal;"<br><br>"latching *only dependent on* the amplified data signal" |

Although Defendants purport to request construction of an entire limitation— "storing data corresponding to the amplified data signal only in response to the amplified data signal"—the dispute actually surrounds the phrase "only in response to."  The parties do not dispute the meaning of "only in response to," but Defendants seek to replace the phrase "in response to" with "dependent on."

Qualcomm asserts that its proposed construction clarifies that plain meaning of "only in response to"—that no other timing signal can induce data storage.  In

/ / /

contrast, Progressive asserts Qualcomm's replacement of "in response to" with "dependent on" is redundant and unnecessary.

The presumed meaning of "only in response to" is the plain and ordinary meaning of the phrase. *Phillips*, 415 F.3d at 1312. "Only in response to" is a general-usage phrase that neither party asserts has any specialized meaning in the art. The plain meaning of "in response to" connotes a stimulus and an effect, but is equivocal as to the exclusivity of that stimulus. But the addition of "only" into the phrase eliminates the equivocality, clarifying that it is singly the function of the designated stimulus that brings about the effect.

Thus, the plain meaning of "only in response to" to a POSITA, read in the context of the claim language, is that data storage (effect) is *exclusively* in response to the the amplified data signal (stimulus). Because both parties agree that this is the meaning of the phrase, any further construction would be redundant. The plain and ordinary meaning of "storing data corresponding to the amplified data signal only in response to the amplified data signal"/"latching the data in response to only the amplified data signal" applies.

## V.   CONCLUSION

For the reasons discussed above, the Court adopts the aforementioned constructions.

**IT IS SO ORDERED.**

September 4, 2014

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**